UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JASON REID LUNDHOLM,<br><br>Defendant. | Case No. 4:23-cr-00314-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Before the Court is Jason Reid Lundholm's motion to suppress (Dkt. 141). The Court held an evidentiary hearing on October 28, 2024 and now issues this Memorandum Decision and Order. For the reasons that follow, the Court will deny Mr. Lundholm's motion.

**BACKGROUND**

**A.    The Surveillance**

On the morning of September 26, 2023, Detective Goms was conducting surveillance on a residence at the corner of Gladstone Street and Emerson Avenue in Idaho Falls, Idaho. At the time, Detective Goms was a detective in the Special Investigations Unit, which had received intelligence that drugs, particularly

**MEMORANDUM DECISION AND ORDER - 1**

methamphetamine, were being sold out of the the residence. This intelligence included information that individuals buying drugs from the residence would generally park on Emerson Avenue near the alleyway and enter the residence from there.

While driving by the residence, Detective Goms noticed a Camry with out-of-town plates parked on Emerson Avenue near the alleyway with someone in the driver's seat and a passenger in the back seat. *See* Gov. Ex. 3. Soon thereafter, he saw a man leave the residence and enter the Camry carrying a paper bag. The Camry pulled away, without signaling, and Detective Goms followed the car as it turned onto the main road, Northgate Mile. Rather than continuing down Northgate Mile onto Holmes Street—the most direct route—the Camry turned off Northgate Mile onto a backstreet before circling back to Holmes Street. *See* Gov. Ex. 4. Detective Goms recognized this evasive driving as a tactic to lose a tail. Detective Goms continued following the car until he saw it turn down a dead end and stop outside a second residence he recognized from previous narcotics investigations.

When he first noticed the Camry parked on Emerson Avenue, Detective Goms had called Officer Wood to advise him that he may be requesting a traffic stop. Detective Goms informed him that the Camry failed to signal before pulling away and had turned down the dead end before directing Officer Wood to make a

**MEMORANDUM DECISION AND ORDER - 2**

traffic stop.

**B.     The Traffic Stop**

At Detective Goms' direction, Officer Wood pulled the Camry over. He informed the driver that the car had a broken brake light and asked for her driver's license, registration, and proof of insurance. Gov. Ex. 1 at 0:27–2:30, Dkt. 146. The driver provided this information and Officer Wood indicated that he probably would not issue a citation for the broken brake light and returned to the car. *Id.* After returning to the vehicle, Officer Wood received a call from Detective Goms checking on him. *Id.* at 3:40–4:20. Officer Wood then attempted to call dispatch to run the driver's information. *Id.* at 4:40, 5:00. After his second attempt to reach dispatch, Officer Picard arrived, and Officer Wood asked him to identify the passengers. *Id.* at 5:10–5:40. Officer Wood tried to call dispatch for the third time to no avail. *Id.* at 5:58. He then muttered to himself "alright, I guess I'll just to it myself" and started typing. *Id.* at 6:13.

Officer Wood continued preparing a written warning for the broken brake light and running the driver's information. He worked uninterrupted until Officer Picard returned from the car with the passengers' information and attempted to call dispatch. *Id.* at 8:20–8:29. Dispatch did not respond, and Officer Picard asked Officer Wood whether he received any response to dispatch, to which he

responded, "no, I had to do it all myself." *Id.* at 8:55–9:00. Officer Picard tried dispatch again and received no response. *Id.* at 9:00. Officer Picard then noted: "They are super nervous. . . that guy in the back [later identified as Mr. Lundholm] has been biting off his damn fingernails." *Id.* at 9:20–9:30. Dispatch finally responded, and Officer Picard read Mr. Wheeler's, the front seat passenger, and Mr. Lundholm's, the backseat passenger, names over the radio. *Id.* at 9:39–9:44. When Detective Goms heard Mr. Wheeler's name, he recognized his name from a pre-existing search warrant.

Soon after, before dispatch returned the information on the passengers, Officer Wood finished preparing and printing the written warning. *Id.* at 10:15–10:22. He gathered the driver's documents and prepared to return to the vehicle. *Id.* at 10:30–10:44. Detective Goms then called again. *Id.* at 10:45. He confirmed that Mr. Wheeler was the front seat passenger before explaining that there was a search warrant for Mr. Wheeler's person and residence. *Id.* 10:47–11:53. Officer Wood and Detective Goms then discussed a plan for searching Mr. Wheeler based either on his consent or the warrant. *Id.* Officer Wood hung up, explained the plan to Officer Picard, and exited the patrol car. *Id.* at 11:54–12:09. He quickly returned when Officer Picard suggested they wait for dispatch to return information on the passengers. *Id.* at 12:10 – 12:40. Officer Wood started to pull up Mr. Wheeler's

information while waiting for dispatch. *Id.* at 12:41–14:15. Dispatch returned information, including that Mr. Lundholm had a warning for guns on person. *Id.* at 14:18–14:25. The two officers then got out of the patrol car and headed towards the Camry. *Id.* at 14:40 – 15:00.

### C.    The Detention and Search

While Officer Wood detained Mr. Wheeler, Officer Picard approached the Camry. *Id.* at 15:06–15:55. He stated that he smelled marijuana in the car and informed the driver and Mr. Lundholm that they would be detained while officers searched the Camry. *Id.* at 15:59–16:40. Officer Picard then placed Mr. Lundholm in handcuffs before sitting him down on the curb. *Id.* at 16:40–18:00. Officers started searching the car and quickly located marijuana under the driver's side seat, which the driver explained belonged to her daughter. *Id.* at 18:00–19:00. Several officers continued to search the car while Officer Wood searched and questioned Mr. Wheeler. *Id.* at 18:05–21:15. Officer Wood briefly updated Detective Goms. *Id.* at 21:20–23:50. Upon returning to the Camry, Officer Wood searched through a paper bag in the backseat, where Mr. Lundholm had been sitting, and located a bag of methamphetamine. *Id.* at 24:40–25:25.

After completing the search of the car, Mr. Lundholm was placed in the back of patrol car and his phone was seized. *Id.* at 25:40–26:20; 1:02:05–1:02:15. Law

enforcement later obtained a search warrant for Mr. Lundholm's phone. Mr. Lundholm now moves to suppress the evidence found in the Camry and the messages found on his phone as fruits of his unlawful detention. The government opposes the motion.

## LEGAL STANDARD

When a defendant contends the government obtained evidence in violation of the Constitution, the government, as the proponent of the evidence, must prove its admissibility by a preponderance standard. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Cales*, 493 F.2d 1215, 1216 (9th Cir. 1974) (holding proper standard for motion to suppress is preponderance, not reasonable doubt).

## ANALYSIS

Mr. Lundholm seeks to suppress the evidence found in the Camry and the messages found on his cell phone. He claims both categories of evidence were obtained as the result of his unlawful detention. In short, he argues the Camry was searched as the result of Officer Wood unlawfully prolonging the traffic stop and his phone was seized, and messages searched, because of the prolonged traffic stop followed by his unlawful detention outside the vehicle. The Court will first address whether the traffic stop was prolonged before considering whether law

enforcement had reasonable suspicion to do so. Finally, the Court will address whether Mr. Lundholm was unlawfully detained.

### D.    Was the Traffic Stop Prolonged?

Officer Wood had probable cause to initiate the traffic stop based on the broken brake light, Nonetheless, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). When a car is pulled over for a traffic violation, "[t]he temporary seizure of the driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citations omitted). When the mission of the stop is complete, law enforcement's authority to seize the individuals in the car ceases. *Id.*

Mr. Lundholm relies on the Supreme Court's decision in *Rodriguez* to argue that law enforcement improperly conducted unrelated inquiries during the traffic stop. The Supreme Court, however, has "made plain" that "inquiries into matters unrelated to the justification for the traffic stop. . . do not convert the encounter

**MEMORANDUM DECISION AND ORDER - 7**

into" an unlawful seizure "so long as those inquiries do not measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333; *see also Rodriguez*, 575 U.S. at 355 (citing *Johnson*). Rather, the "critical question. . . is whether the [tasks unrelated to the traffic mission] prolongs—i.e., adds time to—the stop." *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015) (internal quotation marks omitted).

The relevant time frame for this analysis is the time in which it took Officer Wood to prepare a written warning for the broken brake light, "check[ ] the driver's license, determine[e] whether there are outstanding warrants against the driver, and inspect[ ] the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. About 10 minutes and 35 seconds into the stop, Officer Wood finished preparing the written warning and was about to exit the vehicle. Gov't Ex. 1, Dkt. 146. By this point, the mission of the stop was complete. Officer Wood had run the driver's information, reviewed her insurance and registration, and prepared the written warning. Mr. Lundholm, however, claims the stop was completed earlier, when Officer Wood said he probably would not issue a citation for the broken brake light. Not so. As Officer Wood testified, issuing a written warning creates a record for law enforcement that the driver has already been warned of the violation. Issuing this warning is well-within the permissible

scope of a traffic stop as it ensures the safe operation of cars on the road. *See Rodriguez*, 575 U.S. at 349.

Undoubtedly, law enforcement thereafter prolonged the stop. About 10 minutes and 45 seconds into the stop and, importantly, after Officer Wood printed the warning, Detective Goms called about Mr. Wheeler. During the call, Officer Wood and Detective Goms discuss a strategy for detaining and searching Mr. Wheeler. After this discussion, Officer Wood and Officer Picard waited for dispatch to return information on the passengers in the car before returning to the Camry. Law enforcement then detained all of the individuals in the car, including Mr. Lundholm, and searched the vehicle. This conduct, occurring during and after the call from Detective Goms, was not related to the mission of the traffic stop and was only lawful if law enforcement had reasonable suspicion to extend the stop.

That, however, is not the end of the analysis. Mr. Lundholm argues the stop was prolonged even before Officer Wood printed the warning. The main cause of this delay, according to Mr. Lundholm, is Officer Wood directing Officer Picard to get the passengers' information. *See Motion* at 6, Dkt. 141. About five minutes into the stop Officer Picard arrived, Officer Wood explained the situation, and asked him to identify the passengers in the Camry. Gov. Ex. 1 at 5:10–5:40, Dkt. 146. This conversation lasted about 30 seconds. *Id.* In the minute or so before Officer

MEMORANDUM DECISION AND ORDER - 9

Picard arrived, Officer Wood attempted to call dispatch twice and was awaiting a response to his second call when he asked Officer Picard to identify the passengers. *Id.* at 4:40, 5:00, 5:10–5:40. When Officer Picard left, Officer Wood tried to call dispatch a third time and, again, received no response. *Id.* at 5:58. He eventually started running the information himself. *Id.* at 6:13. As such, the conversation with Officer Picard did not extend the duration of the stop because it happened while Officer Wood was waiting for a response from dispatch.

It follows that Officer Picard's inquires of the Camry's passengers did not extend the stop. At the hearing, Mr. Lundholm insisted that, under *Rodriguez*, Officer Picard could not ask for the passengers' information or conduct any inquiries unrelated to the traffic stop. While he is correct that demanding "a passenger's identification is not part of the mission of a traffic stop," the application of that principle to this case is misplaced. *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019). Indeed, *Rodriguez* makes clear that an officer "may conduct certain unrelated checks during a traffic stop" so long as he does "not do so in a way that prolongs the stop." *Rodriguez*, 575 U.S. at 355. The constitutional violation stems not from the inquiries themselves, but the *extension* of the length of a detention to conduct those inquiries. *Id.* Here, Officer Picard's questions to the passengers did not prolong the stop because Officer Wood was

still preparing the warning.

There is no other basis to conclude that the traffic stop was extended.[1] The length of the stop is clearly attributable to dispatch's failure to respond, and the time required for Officer Wood to run the driver's record checks himself while preparing the written warning. Any suggestion that the length of time, alone, renders the stop unconstitutional is unpersuasive and contrary to case law. *See United States v. Sharpe*, 470 U.S. 675, 683 (1985) (reversing court of appeal's conclusion that detention became an arrest based on the length of the stop alone). Similarly, Mr. Lundholm's insistence that Officer Wood's decision to call for back-up somehow makes the stop constitutionally suspect is unsupported. Officer Wood requested back-up because there were three people in the car, which made it a more dangerous situation for a single officer. As the Supreme Court has recognized, "[t]raffic stops are especially fraught with danger to police officers." *Rodriguez*, 575 U.S. at 356. Moreover, requesting back-up did not delay the stop because Officer Wood continued preparing the warning and did not wait for

---

[1] There was a brief discussion at the suppression hearing regarding whether Officer Wood extended the stop to wait for a K-9 unit. Ultimately, no K-9 unit arrived. Nonetheless, roughly 3 minutes and 49 seconds into Officer Wood's Body Cam Footage, Detective Goms says something indecipherable, but ending with "we don't have a K-9." Gov. Ex. 1 at 3:49–3:53. Accordingly, there is no basis to conclude that the potential arrival of a K-9 unit prolonged the stop when early in the stop, Officer Wood knew no K-9 unit was coming.

backup to arrive before proceeding. *Cf. United States v. Jones*, 438 F.Supp.3d 1039, 1052 (N.D. Cal. 2020) (finding officers prolonged the stop by calling and waiting for back-up and questioning detainees about matters unrelated to the traffic stop). Accordingly, the traffic stop was only extended after Officer Wood finished printing the warning and was preparing to return to the Camry.

### E.  Did Reasonable Suspicion Exist to Prolong the Stop?

"[A]n officer may prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion." *Evans*, 786 F.3d at 788. Reasonable suspicion exists "when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014). While a "mere hunch does not create reasonable suspicion, the level of suspicion required is considerably less than proof of wrongdoing by a preponderance of the evidence and obviously less than is necessary for probable cause." *Id.* at 397 (internal quotation marks and citation omitted). Reasonable suspicion may be based upon the collective knowledge of the officers. *United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010). The collective knowledge doctrine generally applies in two situations. First, "where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has

independently learned" and, second, "where an officer (or team of officers), with direct personal knowledge of *all* the facts necessary to give rise to [reasonable suspicion] directs or requests that another officer. . . conduct a stop, search, or arrest." *United States v. Ramirez*, 473 F.3d 1026, 1032–33 (9th Cir. 2007). As indicated at the suppression hearing, the Court must consider the information known to the officers before Officer Wood printed the written warning and the stop was prolonged.

When Officer Picard requested dispatch run Mr. Wheeler's information, law enforcement had reasonable suspicion that the individuals in the Camry were involved in criminal activity. At this point, the officers, collectively, knew that the Camry left a residence being surveilled based on information that drugs were being sold there. The Camry was parked near the alleyway outside the residence, where law enforcement knew people parked while purchasing drugs. Detective Goms saw the front passenger get into the car carrying a paper bag. The Camry then took an indirect route to its next location, another residence the officers knew from other drug investigations. During the traffic stop, Officer Picard observed the passengers behaving nervously in the car—an observation Officer Wood echoed. Finally, Detective Goms recognized Mr. Wheeler's name from a search warrant. The search warrant was based upon information that Mr. Wheeler was selling

methamphetamine, that his source lived at the residence on the corner of Gladstone and Emerson that the Camry had just left, and that Mr. Wheeler was manufacturing other narcotics. This information, taken together, is sufficient to provide the officers with "a particularized and objective basis for suspecting" the individuals in the Camry were involved in criminal activity. *Navarette*, 572 U.S. at 397.

Even so, when conducting an investigatory stop, officers must "diligently pursue[ ] a means of investigation. . . likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686. A review of the body camera footage indicates officers proceeded diligently to investigate suspected drug crimes. Law enforcement made a plan to search Mr. Wheeler based on consent or, if he refused, the warrant. Once dispatch returned information on Mr. Lundholm and Mr. Wheeler, including that Mr. Lundholm had a warning for guns on person, the officers returned to Camry. They detained Mr. Wheeler, and Officer Picard indicated that he smelled marijuana from the Camry.[2] They proceeded to detain the driver and Mr. Lundholm before

---

[2] Mr. Lundholm suggests Officer Picard stated he smelled marijuana in order to manufacture probable cause. The Court found Officer Picard's testimony credible and supported by the video footage submitted to the Court. The officers, therefore, also had probable cause to search the vehicle based upon the smell of marijuana. *See United States v. Baron*, 472 F.2d 1215, 1217 (9th Cir 1973).

beginning their search of the car. Officers quickly located marijuana and other narcotics in the front seat of the car. Roughly nine minutes after Mr. Lundholm was detained, Officer Wood located the methamphetamine in the backseat of the car. Accordingly, Mr. Lundholm's request to suppress the evidence found in the Camry is denied.

### F.    Was Mr. Lundholm Unlawfully Detained?

Mr. Lundholm argues that he was unlawfully detained while law enforcement searched the Camry, which led to the seizure of his cell phone. The Court disagrees. "[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). Since law enforcement had reasonable suspicion that the individuals in the Camry were involved in drug activity, they had the authority to temporarily detain Mr. Lundholm while they investigated the suspected drug activity.

Mr. Lundholm also takes issue with the use of handcuffs to detain him, suggesting their use transformed his detention into an arrest. Mr. Lundholm argues suppression of the material from his phone is therefore warranted because "had [he] not been arrested, he would have been free to leave" and his phone would not

have been seized. *Response* at 5, Dkt. 6. Even assuming Mr. Lundholm was arrested rather than detained, "evidence will not be excluded as fruit unless the illegality is at least the but for cause of the discovery evidence." *United States v. Pulliam*, 405 F.3d 782, 786 (9th Cir. 2005) (internal quotation marks omitted).[3] The unlawful arrest was not the but for cause of the discovery of Mr. Lundholm's cell phone. Indeed, but for the arrest, Mr. Lundholm still would have been detained. As such, he would not have been free to leave, and his cell phone would still have been seized after law enforcement located the drugs in the car. Mr. Lundholm, therefore, cannot establish the required causation to warrant suppression of the evidence from his cellphone and his motion to suppress is denied.

## ORDER

**IT IS ORDERED that** Defendant's Motion to Suppress (Dkt. 141) is **DENIED**.

---

[3] Whether, and when, an investigatory detention transforms into an arrest is a fact- and circumstance-specific inquiry. *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009). The use of handcuffs, alone, does not necessarily transform a detention into an arrest. *See Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995). The parties did not address this question in much depth in the briefing or at the hearing. Given that resolving this issue is unnecessary to resolve the motion, the Court will assume the investigatory detention transformed into an arrest when officers placed handcuffs on Mr. Lundholm.

DATED: November 4, 2024

B. Lynn Winmill
U.S. District Court Judge